695 A.2d 353

FERDINAND C. MAIORINO, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. SCHERING–PLOUGH CORPORATION, JAMES REED, RONALD MARTINO, AND JEROME A. SHERMAN, DEFENDANTS–APPELLANTS AND CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 17, 1996—Decided June 25, 1997.

324

Before Judges MICHELS, MUIR, Jr., and COBURN.

*Vincent J. Apruzzese* argued the cause for appellants and cross-respondents (*Apruzzese, McDermott, Mastro & Murphy,* attorneys; *Mr. Apruzzese,* of counsel; *Mr. Apruzzese, Sharon P. Margello, Richard C. Mariani, Jerrold J. Wohlgemuth,* and *Daniel P. Murphy,* on the brief).

*Bruce P. McMoran* argued the cause for respondent and cross-appellant (*Barry & McMoran,* attorneys; *Mr. McMoran,* of counsel; *Mr. McMoran, John J. Barry, Colleen D. Shiarella,* and *Carmen J. DiMaria,* on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Defendants Schering–Plough Corporation (Schering), James Reed (Reed), Ronald Martino (Martino), and Jerome A. Sherman (Sherman) appeal (1) from a judgment of the Law Division entered on a jury verdict that awarded plaintiff Ferdinand C. Maiorino (Maiorino) (a) compensatory damages in the total

amount of $435,000, consisting of $180,000 for back pay, $200,000 for front pay, and $55,000 for pain, suffering, and humiliation, and (b) punitive damages in the amount of $8,000,000 against Schering; (2) from an award of attorneys' fees and costs totalling $396,-989.35; and (3) from a post-judgment order that denied their motions for judgment notwithstanding the verdict, a new trial, or a *remittitur* in this age discrimination suit brought pursuant to the provisions of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1, *et seq.* Maiorino cross-appeals from that portion of the judgment that awarded him attorneys' fees and costs totalling $396,989.35, contending that the trial court should have applied a contingency fee enhancer to the lodestar to increase his award of attorneys' fees.

The proofs at trial established that Schering is a manufacturer of pharmaceutical products with a net worth of approximately $1,820,800,000 and an annualized 1994 net income of $987,800,000. Reed was Schering's District Sales Manager of the South Jersey District from 1987 through July 1991, and supervised Maiorino. Martino was Schering's Mid–Atlantic Regional Director from 1987 through December 1990, and was Reed's supervisor. Sherman replaced Martino as Schering's Mid–Atlantic Regional Director in January 1991.

Maiorino, who was born on February 18, 1928, began working for Schering in March 1956. Although he had various titles, Maiorino was essentially always a sales representative, which required him to sell Schering's products to physicians, pharmacists, and hospitals. In his performance reviews from 1956 through 1987, Maiorino was rated between satisfactory and very good. During that period he was never warned about his attendance, placed on probation, or suspended.

In September 1987, Reed evaluated Maiorino's performance for 1985 and 1986. Schering's performance evaluation had seven possible rankings: O—Outstanding; V—Very Good; G—Good; I—Improvement Needed; U—Unsatisfactory; and N—Not Rated. An "Outstanding" rating indicated that "performance is ex-

ceptional in all areas and is easily recognizable as being far superior to others." "Very Good" meant that "results clearly exceed most position requirements. Performance is of a high quality and is achieved on a consistent basis." "Good" denoted a "competent and dependable level of performance. Meets all performance standards of the job." "Improvement Needed" indicated that the "incumbent meets minimal job standards, however, some improvement is desirable." "Unsatisfactory" demonstrated that "results are generally unacceptable and require immediate improvement. No salary increase should be granted to individuals with this rating, and a written action plan must be prepared by the unit manager and forwarded to personnel." "Not Rated" signified that the particular criteria was "not applicable or too soon to rate."

Based on sales performance and standard subjective sales skills, Reed rated Maiorino's 1985 and 1986 performance "Good." For the period, Maiorino ranked ninth in the district in the sale of prescription drugs and fifth in the district in the sale of over-the-counter medicines. His composite rank was tenth. The record, however, does not reflect the total number of salespersons against whom Maiorino was compared. In eight of the subjective criteria, Maiorino was ranked "Good," while in two he was rated "Very Good." Reed testified, however, that just comparing the number of ratings, for example the number of "Very Goods" to the number of "Goods," did not play a large role in his evaluation process. Reed gave Maiorino an overall rating of "Good" for the period. In the comments section of the evaluation, Reed noted that "Mr. Maiorino is a true professional sales representative."

In August 1988, Reed evaluated Maiorino's performance for the period between June and December 1987. The evaluation was based on three different aspects: market share information, quota attainment, and subjective evaluations of various sales skills. In the evaluation, Reed attained a 124.74% figure in quota attainment which meant that he had exceeded his quota by 24.74%. As a result, he was ranked first of nine in his district and twelfth of

over one-hundred in his region. He also achieved a composite ranking of first in his district and eighth in the region. In addition, Reed rated Maiorino "Very Good" in six of the sales skills categories and "Good" in the remaining four.

For his achievement, Maiorino was named most valuable representative in the district for 1987. He also received a "Diamond 110 Club" award, which was given to sales representatives who attained at least 110% of their quota assignment. For earning the award, Maiorino received letters of congratulations from Reed and a Schering executive as well as a weekend trip to a local resort. Nonetheless, Maiorino only received an overall rating of "Good" for the period. His ranking was the lowest that Reed distributed for that period. Three employees who were younger than the fifty-nine year old Maiorino and who also had lower numerical standings nevertheless received higher overall ratings: Michael Geiger, who was forty, was rated "Very Good"; Barry Brader, who was also forty, was rated "Outstanding"; and Howard Abramson, who was twenty-eight, was rated "Very Good."

At trial, Reed attempted to describe how he evaluated employee performances. First, Reed admitted that numbers play a "considerable" role; however, he also said that he did not just consider the numbers, but also considered the salesperson's success with "major" products, i.e., products that Schering was trying to push. He noted that on two major products Maiorino was ranked seventh and eighth in the district, but conceded that on two other major products Maiorino was ranked first and second. Reed also stated that he took into account extenuating circumstances in doing the evaluations. For instance, he noted that Abramson covered an "unsavory" neighborhood and also had to handle adversity when a large chain store switched products. In addition, Reed testified that the sales skill portion of the evaluation was subjective and that where such evaluations were permitted by the Schering's policy handbooks, they were to be limited.

The record is somewhat ambiguous as to the effect that the overall evaluation of "Good" had on Maiorino financially. Richard

Happel, Schering's Vice-President of Human Resources, testified that employees who received a rank of "Very Good" or better were eligible for an equity increase, while those who received a rank of "Good" were only entitled to a merit increase. Schering claims that as a result of Maiorino's 1986 "Good" rating, he received only a merit increase, while Maiorino contends that he received the merit increase as a result of his 1987 rating. At trial, Happel asserted that it was Maiorino's 1986 product data, rather than his sales skill ratings, which formed the basis of his merit increase in 1988.

In 1988, Schering dropped the quota attainment criteria from its performance evaluation. From that point forward, performance evaluations were to be based on market share and market share change as well as sales skills. Under market share, a sales representative's performance would be compared to Schering's competitor's performance in the same area. Each representative's market share change—the difference in the market share from one period to another—was then compared to other Schering representative's in the same district and region.

In April of 1989, Reed evaluated Maiorino for his 1988 sales performance. Pursuant to the market share change criteria, Maiorino ranked above the district average on three products, below it on two, and suffered a very low ranking on one other product. According to a letter from Reed, Maiorino's incentives in 1988 earned him a ranking of eighth in a district of nine. In his sales review, Maiorino earned five marks of "Very Good," one of "Good Plus," and five of "Good," and his overall rating was "Good."

In May 1989, Schering offered the first of two voluntary early retirement programs. The early retirement program was offered to all sales employees over the age of fifty-five who had given Schering at least ten years of service. Schering had instituted the program in response to a number of requests by its sales employees who wanted to retire, but who felt that the pension plan was financially inadequate. Schering did not offer the program for its

own financial reasons or because it wanted to downsize. When offering the program, Schering informed all eligible employees that if they felt pressured by another Schering employee to accept the offer, they should contact Schering's director of personnel. Schering's director of personnel, however, never received any complaints.

When it instituted the retirement program, Schering also hired more employees in the sales area than it normally would have hired since it had anticipated that a large number of employees eligible for the early retirement program would accept it. Schering acknowledged that if fewer employees had accepted the retirement program than it had anticipated, then it would have created new territories for the extra employees that it had hired. This action was not necessary, however, since Schering hired fewer new employees than those who left under the early retirement plan.

Maiorino, who was eligible for the early retirement program, declined to accept the offer since he had upcoming expenses. Maiorino testified that Reed told him that the retirement program was a good offer and that he (Maiorino) was "foolish" if he did not accept it. At trial, Reed said that although he could not recall, he did not think that he ever called Maiorino foolish for not taking the early retirement.

In October 1989, Reed evaluated Maiorino's performance for January through June 1989. The evaluation took place one or two months after the early retirement program had ended. Maiorino's overall rating was "Good," but Reed noted that in relation to his abilities, Maiorino "did not have a very good sales period," and needed to "devote more time to preparation prior to making physician calls." During the period, Maiorino's market share change improved in five products while it declined in two; nevertheless, he was ranked eighth of nine in the district in incentive earnings. Interestingly, Maiorino's sales skills were rated "Good" overall even though he had received ten "Very Good[s]," six "Good Pluses," and only one "Good" in the field visits on which his rank

was based. The field visits had occurred before the end of the early retirement program.

Reed testified that after Maiorino's 1988 evaluation, he met with Maiorino to discuss how Maiorino could improve, but that Maiorino rejected Reed's thoughts and ideas. For instance, Reed suggested that Maiorino use reprints and literature in his presentations; Maiorino, however, did not follow this advice. Reed also requested that Maiorino submit sales goals for each quarter of 1989, but Maiorino declined, responding that he "opted *not* to [set goals] at this time."

In 1989, Maiorino lived in Hamilton Square, New Jersey, which was within his territory, while Reed lived approximately seventy miles away in Landenberg, Pennsylvania. The drive from Reed's home to Maiorino's home took between one hour and thirty minutes and one hour and forty-five minutes. On October 10, 1989, Reed travelled approximately seventy-five miles to interview a job applicant near Maiorino's house. Reed admitted that there were no job openings at the time, but noted that he wanted to keep his interviewing skills sharp and that the interview was a favor to an important client. After the interview, Reed drove by Maiorino's home.

Schering had a policy which permitted sales managers who believed that their employees were not working full days to go to the employee's residence and observe whether they were at work. Besides Maiorino, however, Reed had checked on only one other employee, David Shelley, at his residence, and he had only checked on Shelley once. Reed stated that he went by Maiorino's house because he was frustrated with Maiorino's performance. Nevertheless, three days earlier, Reed had given Maiorino an overall performance evaluation of "Good."

When Reed went by Maiorino's house, he noticed that Maiorino's car was still in the driveway at 10:30 a.m., although Maiorino had not called in late. Maiorino admitted that he knew he was supposed to call his supervisor if he was going to be late for work. Schering's Sales Policy and Procedure Manual noted that the

standard work hours were 8:30 a.m. to 5:00 p.m. Yet, in April of 1989, Schering had also distributed a bulletin in which it informed all sales representatives that they had complete freedom to plan their own schedules as long as they "put in a full day's work each day."

Although Reed's job included counseling employees with problems, he did not confront Maiorino concerning his (Maiorino's) being at home at 10:30 a.m. Instead, he apprised the Regional Director, Martino, of the situation. Martino directed Reed to keep driving by Maiorino's home to check to see if his car was there past 8:30 a.m. Martino also reported the incident to Schering's home office which in turn instructed Martino to tell Reed not to confront Maiorino over the situation. Pursuant to Martino's instruction, Reed continued the surveillance of Maiorino's home and found him to be late on six other occasions: November 6, 1989; November 7, 1989; November 28, 1989; December 5, 1989; January 8, 1990; and January 29, 1990. Following the home office's directive, Reed never confronted Maiorino concerning the incidents, although he met with Maiorino and sent Maiorino memos between October 10, 1989, and January 29, 1990. In fact, no one discussed the incidents with Maiorino or issued him a written warning.

At the end of each work week, Maiorino was expected to fill out a time sheet recording the number of hours he had worked. Except for January 29, 1990, Maiorino filled in a full day's work for each of the days he had been observed by Reed. In addition, Maiorino conceded that he had reflected a three-quarter work day on January 29th after Reed had told him of the surveillance on that date. Reed acknowledged that he did not know how many hours Maiorino actually worked on the days he had observed Maiorino's car at Maiorino's home and did not know whether Maiorino had made the calls he reported on those days. Maiorino noted that he sometimes worked late.

Schering had an absentee policy in which three "latenesses" were defined as an "absence occurrence." Upon five occurrences,

or fifteen latenesses, an employee was to receive a verbal warning. Upon six occurrences, or eighteen latenesses, an employee was to receive a written warning. Upon seven occurrences, or twenty-one latenesses, an employee was to receive a one-day suspension. Upon nine occurrences, or twenty-seven latenesses, an employee was to be discharged. Schering also had a policy which permitted termination if records were falsified.

On February 1, 1990, Reed had Maiorino meet him at Mastoris's Diner near Maiorino's home. Reed noted that he usually went to the diner when he met with Maiorino to discuss business matters because Schering did not have an office in Maiorino's territory. Schering had a sales office in Kenilworth, which was approximately fifty minutes from Maiorino's home. During the meeting, Reed informed Maiorino that he would be suspended for two days without pay. The suspension was Maiorino's first since he had been with Schering. Martino testified that he had originally wanted to give Maiorino only a warning, but that the home office had required a suspension instead, and that "somewhere above" him in Schering the dates of the suspension had been set.

Reed handed Maiorino a memo that indicated that on January 29, 1990, he had seen Maiorino's car in the driveway for the seventh time when he should have been in the territory. The memo, however, did not give the other six dates on which Reed viewed Maiorino's car at the latter's home. The memo also reflected that Maiorino had reported a full day's work on the first six occasions. Reed testified that he suspected that Maiorino would become upset when he informed him of the suspension. Indeed, when Maiorino was told of the suspension, he became "very, very, very upset[,] [v]ery angry," which resulted in an "ugly scene."

On February 5, 1990, before the suspension took effect, Maiorino wrote Reed and explained that he had been late on January 29th because he was attending to a family medical emergency. He also explained that he could not respond to the other alleged dates since he did not know when they occurred. On March 7,

1990, after Maiorino had already served his suspension in mid-February, Reed wrote to Maiorino and gave him the other six dates. Maiorino responded on March 15, 1990, stating that on those other dates he was possibly at home refurbishing his supplies, dealing with an illness, helping sick family members, or aiding family members with their vehicles. He never denied that his car was home during the hours Reed allegedly observed it, and he never stated that he had worked later hours on those days, although he testified that he sometimes worked until 7:00 p.m.

On June 22, 1990, Reed put Maiorino on probation through December 1990, citing poor performance from 1988 through February 1990. Reed had given Maiorino a performance evaluation of "Improvement Needed" for the period of July 1989 through June 1990. Nevertheless, just prior to the probation, Maiorino had received high rankings in the sale of two products—Vanceril and Prevental Solution. Reed informed Maiorino that if he did not meet the terms of his probation, he faced possible termination. Reed stated that he continued to counsel and offer assistance to Maiorino throughout his (Maiorino's) probationary period. In addition, Reed continued his regular field visits with Maiorino.

The terms of Maiorino's probation were not entirely clear. In the probation letter, Reed stated that he measured performance by the overall amount of incentive monies earned. Yet, at trial, Reed said he considered other factors besides just incentive monies in measuring performance. Reed declared that to complete probation successfully, Maiorino had to achieve the same average market share change for each of the seven products he was selling for the cycle ending December 31, 1990, as had been achieved by the entire district for the preceding cycle which ended October 31, 1990.

According to the probation letter, Maiorino's performance was to be measured in terms of market share change or, possibly, incentive monies earned. Nevertheless, at the end of Maiorino's probationary period, Reed wrote that he considered the "most current barometer" of success to be based on a formula he

described as "CQTY minus MATTY." Sherman testified that the formula "CQTY minus MATTY" was the equivalent of market share change. Reed, however, stated that this formula did not reflect market share change. In any case, prior to his probation, Maiorino had a higher "CQTY minus MATTY" rank than three younger employees in his district.

In July 1990, eight days after Maiorino was put on probation, Schering offered another voluntary early retirement program. This program was instituted because employees in the home office complained that it was not fair to offer the program only to sales employees. Eligibility for the second program was the same as the first: employees had to be at least fifty-five with ten years experience at Schering. Again, the program was voluntary and Schering set up procedures to report any coercive action. Happel noted that no employee ever contacted him about being coerced. Maiorino again rejected the early retirement program. Of the eight employees in Schering's mid-atlantic region who were eligible but rejected the early retirement program in 1989 and 1990, only Maiorino was ultimately fired. In fact, a few of the other employees were promoted.

The only other person put on probation at the same time as Maiorino was David Shelley, who was put on probation in May 1990. Shelley was approximately twenty years younger than Maiorino. Shelley was surprised to find that he was on probation and accused Reed of intentionally spilling coffee on his (Shelley's) performance review so that Reed could replace it with a less favorable review which could be used as a precursor to probation. Shelley's terms of probation were originally to attain the average market share change for certain "incentivised" products. Shelly was told the incentivised products *"may* include the Proventil Family and Theo–Durf[.]"  Later, however, Shelley's probation was changed to include the average market share change for all products, just as in Maiorino's probation. The record does not reflect whether Shelley met the requirements of his probation, but

it appears that Shelley remained employed with Schering after his three month probation period expired.

Maiorino's performance during his probation appears to have been average when compared to the other sales representatives in his district. For the July/August cycle, he was nationally ranked twenty-seventh of five hundred fifty for market share change in the drug Eulexin. He also received incentive monies for his performance on drug sales as well as on his composite performance. He was ranked in the top 20%, 50%, and 60% on different products. In addition, in the "CQTY minus MATTY" formula results which were distributed monthly between June 1990 and January 1991, Maiorino was usually average in overall sales. Reed sent Maiorino these results each month.

By the end of December 1990, Maiorino was ranked number 254 of between 505 and 550 sales representatives nationally in market share composite: he was almost exactly in the middle of the rankings. In his district, four sales representatives were ranked higher than he was ranked, and four were ranked lower. Schering contends that this result did not matter since Maiorino was being tested on market share change rather than just market share. Schering notes that in overall market share change for the period between June and December 1990, Maiorino was ranked ninth of nine.

No one from Schering contacted Maiorino in January or February 1991 to inform him as to whether he had successfully completed probation; however, market numbers for preceding months were normally not available for approximately five to six weeks. On February 20, 1991, Reed wrote Sherman concerning Maiorino's probationary progress. In the memo, Reed acknowledged that Maiorino had met the district average for two products. Reed also suggested that he had used the "CQTY minus MATTY" equation to gauge Maiorino's performance. After evaluating Maiorino's probationary performance, Reed recommended that Maiorino be terminated.

Sherman, however, did not approve of the termination. Sherman testified that he felt "uncomfortable" with Maiorino's probationary program; he also felt that its goals were "fuzzy." In addition, Sherman noted that he wanted to give Maiorino, a long-standing employee, another opportunity with a program that had more clearly defined goals. Consequently, on March 1, 1991, Maiorino was put on a second probation. Pursuant to the terms of his probation, he was required to meet the market share change/growth for two products—Prevental Repetabs and Vancenase AQ—that equalled the district's growth for those products. Reed said that those two products were chosen since they were the major drugs being promoted by Schering. The market share growth was to be measured by comparing the January 1991 market share to the May 1991 market share. Since the numbers which were going to be used related to January's figures, Maiorino deemed the probationary period retroactive. No other sales representatives, who were all younger than Maiorino, were required to meet such a goal for the two products.

During the first two cycles of 1991, Maiorino earned incentive monies based on his composite rank, but did not earn incentive monies based on the two probationary products. In the first cycle he had a market share composite rank of 253 of approximately 550, while in the second cycle he had a rank of 283. In addition, pursuant to the "CQTY minus MATTY" formula, Maiorino's overall performance appeared to be average. In fact, of the seven people who did not meet the "CQTY minus MATTY" district average for the two products in April, only Maiorino was on probation and the other six were younger than Maiorino. During the second probationary period, Reed made several field visits with Maiorino and followed them up with memos which offered suggestions to improve Maiorino's sales. By the end of May, Maiorino showed positive increases in both products; he did not, however, meet the probationary goals.

Since Maiorino did not meet the probationary goals, Schering decided to terminate his employment. Sherman had drafted a

termination letter on June 2, 1991, which apparently incorporated May's sales figures. Nevertheless, Sherman had seemingly received April's sales figures only the day before. As noted, sales numbers for preceding months were normally not available for five to six weeks. At trial, Sherman initially could not explain how he had received the May figures only a day after receiving the April figures and had said during his deposition that he had to determine whether he had "mock[ed] up or something" regarding the May figures. Later, however, he testified that he had received the May figures on June 2 before drafting the termination letter; nevertheless, he did not know how he was able to get the figures so early.

Reed instructed Maiorino to meet him and Sherman at Mastoris's Diner on July 15, 1991. This was the same diner in which Reed had suspended Maiorino. At the diner, Sherman and Reed handed Maiorino a letter of termination which stated that he was being fired because he had failed to meet his probationary criteria in the sale of Proventil Repetabs and Vancenase AQ. At the time, Maiorino was nearly sixty-three and one-half years old. Sherman and Reed also offered Maiorino "double" severance, in addition to Schering's regular severance pay, if he agreed to waive any rights that he had against the company. This offer appears to have been standard Schering policy for employees who were terminated for certain reasons such as an employee's inability to meet the requirements of his/her position or a reduction-in-force.

After terminating Maiorino, Sherman, Reed, and a third employee followed Maiorino to his home where they retrieved Maiorino's drug samples, literature, and company car. Reed testified that pursuant to FDA guidelines, Schering had to account for all of its drug samples; accordingly, Schering's policy was to pick up all drug samples upon termination for fear that they would be distributed unlawfully. Reed also noted that it was company policy, regardless of an employee's age, to recover company cars, expense reports, and literature upon termination. Schering replaced Maiorino with a new sales representative who was between twenty-four and thirty years of age.

At the conclusion of the proofs, the jury awarded Maiorino compensatory damages of $435,000, consisting of $180,000 for back pay, $200,000 for front pay, and $55,000 for pain, suffering, and humiliation. The compensatory damages applied to all defendants. The jury also found that Schering's conduct was sufficiently "wanton, reckless[,] and malicious to warrant punitive damages." Prior to the jury's determination of punitive damages, Maiorino dismissed his claims for punitive damages against Reed, Martino, and Sherman. Following additional summations from the parties and the trial court's instructions concerning the standard for punitive damages, the jury returned a verdict of $8,000,-000 in punitive damages against Schering. The trial court entered judgment against Schering in the total amount of $8,435,000, denied Schering's, Reed's, Martino's, and Sherman's post-trial motions for judgment notwithstanding the verdict, a new trial, or a *remittitur* and awarded Maiorino attorneys' fees and costs of $396,989.35. This appeal and cross-appeal followed.

Defendants seek a reversal of the judgment and the entry of judgment notwithstanding the verdict, both with respect to liability and punitive damages; a new trial on all issues; or a new trial on damages. If they are not granted judgment or a new trial, defendants seek a *remittitur*. Defendants also seek a reversal of the award of attorneys' fees, or, alternatively, a decrease in the amount of the fees awarded. Maiorino cross-appeals from the amount of the award of attorneys' fees and costs, contending that the trial court erred in refusing to apply a contingent fee enhancement to the lodestar.

## I.

### DEFENDANTS' POST TRIAL MOTIONS CONCERNING THEIR LIABILITY UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION

Defendants contend that the trial court erred when it failed to grant their motion for judgment notwithstanding the verdict, or,

alternatively, when it failed to grant their motion for a new trial as to their liability. They argue that the evidence, when viewed in a light most favorable to Maiorino, does not support Maiorino's claim of disparate treatment based on age. They claim that there was no evidence of a conspiracy by Schering to rid itself of older employees through the use of the early retirement plans. On the contrary, they emphasize that the program was voluntary and pro-employee—to give employees the opportunity to retire early. Defendants point out, moreover, that other employees refused the program without suffering adverse action.

Defendants also maintain that Maiorino's suspension was proper since Maiorino's surveillance occurred pursuant to company policy and Maiorino falsified time sheets. In addition, they contend that there was no evidence that any younger employee in similar circumstances was treated differently. In regard to Maiorino's first probation, defendants claim that there was no age discrimination since Shelley was given the same probationary criteria as Maiorino; defendants contend, moreover, that even if the second probation may have been unreasonable because it was retroactive, it still did not reflect age discrimination.

Defendants also argue that the policy of terminating an employee in a public area applied to all employees regardless of their age, as did their policy with respect to the recovery of company vehicles and sample drugs. Defendants further assert that there was no evidence of age discrimination in the 1988 raises since they were based on 1986, not 1987, performance, and that there was no age discrimination in the 1987 ratings since three variables, rather than just quota attainment, were considered and justified giving the three younger employees higher rankings than Maiorino. Finally, defendants claim that Maiorino performed poorly when Schering switched from the quota attainment ranking system to the market share change system, and that he failed to meet the requirements of his second probation.

In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, we " 'must accept as true all the

evidence which supports the position of the party defending against the motion and must accord him the benefit of all legitimate inferences which can be deduced therefrom, and if reasonable minds could differ, the motion must be denied.'" *Lanzet v. Greenberg,* 126 *N.J.* 168, 174, 594 *A.*2d 1309 (1991) (citation omitted). *See also Dolson v. Anastasia,* 55 *N.J.* 2, 5, 258 *A.*2d 706 (1969). Thus, a reviewing court should not disturb a trial court's denial of the motion if the evidence, along with all legitimate inferences therefrom, could uphold a judgment in favor of the non-moving party. *Lanzet v. Greenberg, supra,* 126 *N.J.* at 174, 594 *A.*2d 1309; *Dolson v. Anastasia, supra,* 55 *N.J.* at 5, 258 *A.*2d 706.

An appellate court's review of a trial court's denial of a motion for a new trial on the ground that the verdict is against the weight of the evidence is different and more flexible than the review of a motion for judgment notwithstanding the verdict. *Lanzet v. Greenberg, supra,* 126 *N.J.* at 175, 594 *A.*2d 1309. A reviewing court can overturn a trial court's decision denying a motion for a new trial if "it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1. *See also Lanzet v. Greenberg, supra,* 126 *N.J.* at 175, 594 *A.*2d 1309. However, in reviewing the trial court's decision, the appellate court must give deference to the trial court's "feel of the case" and ability to assess witness credibility and demeanor. *See Lanzet v. Greenberg, supra,* 126 *N.J.* at 175, 594 *A.*2d 1309; *Dolson v. Anastasia, supra,* 55 *N.J.* at 7, 258 *A.*2d 706.

Tested against these standards, the trial court properly denied defendants' motions for judgment notwithstanding the verdict and for a new trial as to liability for age discrimination.

Certain employment discrimination is prohibited under the New Jersey Law Against Discrimination (LAD), which is set forth in *N.J.S.A.* 10:5–1, *et seq.* Maiorino brought his claim pursuant to

*N.J.S.A.* 10:5–12, which, in pertinent part, provided: [1]

> It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:
>
> a. For an employer, because of the race, creed, color, national origin, ancestry, *age,* marital status, affectional or sexual orientation, sex or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or *to discharge* or to require to retire, *unless justified by lawful considerations other than age, from employment such individual* or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. . . .

[Emphases added.]

The purpose of the LAD is to ban discrimination based on the grounds given in *N.J.S.A.* 10:5–12. *See N.J.S.A.* 10:5–3. " 'The clear public policy of this State,' reflected in the LAD, 'is to abolish discrimination in the work place.' " *Shaner v. Horizon Bancorp.,* 116 *N.J.* 433, 436, 561 *A.*2d 1130 (1989) (quoting *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (1988)). The LAD is interested in more than just individual victims of discrimination; it recognizes that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State[.]" *N.J.S.A.* 10:5–3.

In an age discrimination case, the plaintiff must "show that the prohibited consideration[, age,] played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Miller v. CIGNA Corp.,* 47 *F.*3d 586, 597 (3d Cir.1995). *See also Slohoda v. United Parcel Serv., Inc.,* 207 *N.J.Super.* 145, 155, 504 *A.*2d 53 (App.Div.), *certif. denied,* 104 *N.J.* 400, 517 *A.*2d 403 (1986). In addition, although the discrimination must be intentional, *see Jansen v. Food Circus Supermarkets, Inc.,* 110 *N.J.* 363, 381, 541 *A.*2d 682 (1988) (citation omitted), New Jersey courts have realized that direct proof of intentional

---

[1] We note that *N.J.S.A.* 10:5–12a was amended by *L.* 1996. *c.* 126, § 5 to prohibit discrimination by employers against an individual based on "genetic information" or because of an individual's "refusal to submit to a genetic test or make available the results of a genetic test to an employer."

discrimination is often not available to a plaintiff, and, thus, discrimination cases can be proved through circumstantial evidence. *See, e.g., Parker v. Dornbierer,* 140 *N.J.Super.* 185, 189, 356 *A.*2d 1 (App.Div.1976).

In analyzing a LAD claim, New Jersey courts have used the framework set forth by federal anti-discrimination statutes: the Age Discrimination in Employment Act set forth in 29 *U.S.C.* § 621, *et seq.* (ADEA), and Title VII of the Civil Rights Act of 1964 set forth in 42 *U.S.C.* § 2000e, *et seq.* (Title VII). *See Waldron v. SL Indus., Inc.,* 849 *F.Supp.* 996, 1000 (D.N.J.1994) ("Age discrimination claims under the LAD and the ADEA are governed by the same standards and burden of proof structures applicable under Title VII of the Civil Rights Act of 1964. . . ."), *rev'd on other grounds,* 56 *F.*3d 491 (1995); *Grigoletti v. Ortho Pharm. Corp.,* 118 *N.J.* 89, 97, 570 *A.*2d 903 (1990) ("In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964. . . ."); *Shaner v. Horizon Bancorp., supra,* 116 *N.J.* at 437, 561 *A.*2d 1130 ("[The LAD] standards have been influenced markedly by the experience derived from litigation under federal anti-discrimination statutes."); *Giammario v. Trenton Bd. of Educ.,* 203 *N.J.Super.* 356, 361, 497 *A.*2d 199 (App.Div.1985) ("[P]laintiffs' [LAD] contentions [of age discrimination] should appropriately be analyzed by examination of federal cases arising under Title VII and the ADEA."), *certif. denied,* 102 *N.J.* 336, 508 *A.*2d 212 (1985), *cert. denied,* 475 *U.S.* 1141, 106 *S.Ct.* 1791, 90 *L.Ed.*2d 337 (1986). However, in conducting this analysis, we must not lose sight of the fact that an employer can legally discharge an employee without violating employment discrimination statutes "for good reason, bad reason, or no reason at all," as long as there is no intentional discrimination. *Walker v. A T & T Technologies,* 995 *F.*2d 846, 850 (8th Cir.1993). Hence, "[t]here is no principal of law that requires that a business' decision be popular with employees. As long as the

decision is not based on unlawful age discrimination, 'the courts have no business telling [companies] ... how to make personnel decisions, which may be objectively or subjectively based.'" *Ibid.* (second alteration and omission in the original) (citation omitted).

Before reviewing the proper procedure in an age discrimination case, we note that it is important to keep in mind that the burden of proving intentional discrimination "remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 253, 101 *S.Ct.* 1089, 1093, 67 *L.Ed.*2d 207, 215 (1981). Turning now to the actual procedure, an age discrimination case follows a three step process. First, the plaintiff bears the burden of persuasion, by a preponderance of the evidence, in establishing a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677 (1973). *See also Andersen v. Exxon Co.,* 89 *N.J.* 483, 492, 446 *A.*2d 486 (1982) ("In [past cases] we adopted the methodology of *McDonnell Douglas Corporation v. Green* ... as a starting point in actions brought under the Law Against Discrimination."). "The burden of establishing a *prima facie* case[, however,] ... is not onerous." *Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 253, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 215.

■ To establish a *prima facie* case of age discrimination, a plaintiff must show that "(1) he was a member of the protected class; (2) he was performing the job at the level that met the employer's legitimate expectations; (3) he was discharged; and (4) the employer sought another to perform the same work after the complainant had been removed from the position." *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 496–97, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994). Once the plaintiff establishes a *prima facie* case, a presumption is created that the employer unlawfully discriminated against the applicant. *Andersen v. Exxon Co., supra,* 89 *N.J.* at 492–93, 446 *A.*2d 486. If in the face of this presumption the employer remains silent, then the employee is entitled to judgment as a matter of

law. *See Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216.

The burden then shifts to the defendant employer to rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Andersen v. Exxon Co., supra,* 89 *N.J.* at 493, 446 *A.*2d 486. The defendant employer, however, only carries the burden of production, rather than persuasion, to show a legitimate, nondiscriminatory reason for its action: "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216 (footnote omitted). The defendant employer need not prove that its proffered reason actually motivated its behavior because throughout this burden shifting model, the burden of proving intentional discrimination always remains with the plaintiff employee. *Martinez v. National Broad. Co.,* 877 *F.Supp.* 219, 228 (D.N.J.1994).

After the defendant employer has sufficiently set forth a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff then has the burden of persuasion to show that the defendant's proffered reason is merely a pretext, i.e. that it was not the true reason for the employment decision. *Andersen v. Exxon Corp., supra,* 89 *N.J.* at 493, 446 *A.*2d 486. A plaintiff may accomplish this by showing that (1) a discriminatory reason more likely motivated the employer than the employer's proffered legitimate reason, or (2) the defendant's proffered explanation is "unworthy of credence." *Texas Dep't of Community Affairs v. Burdine, supra,* 450 *U.S.* at 256, 101 *S.Ct.* at 1095, 67 *L.Ed.*2d at 217.

In *St. Mary's Honor Center v. Hicks,* 509 *U.S.* 502, 113 *S.Ct.* 2742, 125 *L.Ed.*2d 407 (1993), the United States Supreme Court confronted the question of whether a plaintiff's showing, by a preponderance of the evidence, that a defendant's alleged legitimate reason was "unworthy of credence" entitles the plaintiff to

judgment as a matter of law. The *Hicks* Court responded in the following manner: "The factfinder's disbelief of the reasons put forward by the defendant ... *may*, together with the elements of the *prima facie* case, *suffice to show intentional discrimination.* Thus, rejection of the defendant's proffered reasons, *will permit* the trier of fact to infer the ultimate fact of intentional discrimination...." *Id.* at 511, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 418 (emphases added and fourth emphasis in original) (footnote omitted). In other words, if a plaintiff proves that a defendant's proffered explanation is not believable, i.e. "unworthy of credence," then a jury may, but need not, and is not required by law to, find that the defendant intentionally discriminated. *Ibid.* This is so because the "plaintiff at all times bears the 'ultimate burden of persuasion'" in employment discrimination cases. *Id.* at 511, 113 *S.Ct.* at 2749, 125 *L.Ed.*2d at 419.

Against this backdrop, we are persuaded that the trial court properly denied defendants' motion for judgment notwithstanding the verdict since the evidence and all legitimate inferences which can be drawn therefrom are sufficient to support a judgment in favor of Maiorino. In addition, the trial court's denial of defendants' motion for a new trial did not result in a miscarriage of justice under the law. The proofs established the necessary elements of a *prima facie* case of age discrimination under the LAD. Maiorino was a member of a protected class. He was fired. Schering admittedly hired a new employee to fill Maiorino's position. The proofs were also sufficient for a jury to find that Maiorino was performing his job at a level which met Schering's legitimate expectations. This latter element was in dispute and its resolution was inextricably linked to Schering's proffered legitimate, nondiscriminatory reason for firing Maiorino, to wit, that Maiorino was incompetent and unproductive, as evidenced by his low sales figures, suspension, and probation. Maiorino's proofs tended to show that he was competent and productive and that Schering's explanation for his termination was "unworthy of credence." The jury resolved this issue in favor of Maiorino, apparently finding that Schering's alleged reason for terminating Maior-

ino was a pretext and "unworthy of credence." Thus, pursuant to *St. Mary's Honor Center v. Hicks, supra,* the jury was permitted to infer discrimination on the part of Schering, and find that a discriminatory reason actually motivated Schering's decision.

Turning to the specific proofs presented, we determine that the evidence, and all legitimate inferences therefrom, could sustain a finding that Schering's legitimate, non-discriminatory reason for terminating Maiorino was not worthy of credence. First, the evidence supports Maiorino's claim that he should have been ranked higher than "Good" in the years prior to probation. Specifically, in 1987, he had an exceptional second-half of the year in quota attainment. Moreover, his market share performance reflected that in four of seven products he ranked first or second in the district. Nevertheless, Maiorino received the lowest ranking in the district: lower than three others who had not sold as well. More questionable was Reed's initial explanation that he ranked salespersons primarily according to the numbers; yet when confronted with Maiorino's 1987 rating, he quickly added that he considered other factors. Even so, in his sales skills categories, Maiorino received more "Very Goods" than "Goods," yet he still was ranked only "Good." Also troubling was Reed's ranking system in which he considered a "variety" of factors: besides Maiorino's 1987 rank, Reed also rated Maiorino "Good" in 1989 after he had a less impressive year in sales but had nevertheless achieved very high marks in the sales skills categories. It arguably appeared that Reed would change the criteria of the rankings to fit the overall rating he had given.

In any case, Maiorino's performance was still rated "Good" for 1987, 1988, and 1989. Schering defined "Good" as a "competent and dependable level of performance. Meets all performance standards of the job." Accordingly, Reed's surveillance of Maiorino—which ultimately led to his suspension—just days after giving him a "Good" evaluation could be viewed by the jury as suspect. Reed tried to explain that he considered a "Good" ranking to be indicative of problems; yet, there was no testimony that in any

earlier years he ever surveilled sales representatives at their homes who received a "Good" rating. Indeed, Maiorino had received that rating for the previous three years and had not been watched. Moreover, Schering permitted the surveillance if a supervisor believed that an employee was not making his routes; here, Reed only testified that he was unsatisfied with Maiorino's performance, not that he believed Maiorino was not working his regular hours. In addition, the jury could find that it was rather unusual that the tardiness of one employee (particularly an employee with over thirty years experience) on one day went all the way up to the home office, which in turn ordered further surveillance, rather than confronting the employee about any tardiness problem.

Further, the evidence reflected problems with Maiorino's first probation. While it is true that immediately prior to his probation Maiorino had received a ranking of "Improvement Needed," he had nevertheless been rated at least "Good" for the previous thirty-two years. In addition, the criteria of his first probation were never clearly delineated; even Sherman admitted he was "uncomfortable" with the probationary goals. More importantly, in the equation that Reed ultimately deemed the barometer of an employee's performance, "CQTY minus MATTY," Maiorino scored at least average in comparison to other sales representatives over the course of his probation.

The jury also could have found from the evidence that the terms of Maiorino's second probation may have been unfair. First, the second probation itself seems somewhat questionable in that it was, as defendants admitted, retroactive in nature. Moreover, Maiorino did well enough during the probation to earn incentive monies in products other than the ones he for which was put on probation. In addition, in April 1991, there were six other employees who were also below average in the two products for which Maiorino was placed on probation; yet, they were not also placed on probation. Maiorino also increased his sales in the two products over the probation time period; he just did not increase

to the level set by Schering. The jury also could have found that Sherman may have written Maiorino's first termination letter before he had received May's sales figures, thereby indicating that Schering may have decided to terminate Maiorino even before his probationary figures were available.

Moreover, the jury could have found from the proofs a discriminatory intent upon the part of defendants. For example, in 1987, despite an exceptional year in sales, Maiorino received the lowest rating in his district while three younger employees, with lower sales numbers, received higher ratings. Further, except for Shelley, no younger employee who received a rating of "Good" was put under surveillance. In addition, Schering placed Maiorino on probation just days before the second early retirement program; a move which may have been interpreted as pushing Maiorino towards taking the early retirement. Prior to being put on the first probation, Maiorino had a "CQTY minus MATTY" rating higher than three younger sales representatives who were not put on probation. As noted, Reed later called that formula the true barometer of performance. During the second probation, employees younger than Maiorino were not placed on probation although they also had below average sales figures in March and April for the two probationary products. Furthermore, Maiorino was replaced by a much younger employee.

In sum, the evidence and all legitimate inferences in favor of Maiorino were sufficient to have a jury determine that defendants' proffered reason for terminating his employment was pretextual and that Maiorino was intentionally discriminated against. Moreover, none of the other issues raised by defendants with respect to judgment awarding Maiorino compensatory damages in the total amount of $435,000 has merit or requires a reversal of that portion of the judgment. *R.* 2:11–3(e)(1)(E).

Accordingly, we hold that the trial court properly denied Schering's motions for judgment notwithstanding the verdict and for a new trial as to liability under the LAD. In addition, in our view,

the LAD liability verdict against defendants was not a miscarriage of justice under the law.

## II.

### SCHERING'S POST–JUDGMENT MOTIONS AS TO PUNITIVE DAMAGES

Schering also contends that the trial court erred in denying its motions for judgment notwithstanding the verdict, for a new trial, or for a *remittitur* as to punitive damages. Schering argues that even if the jury's finding as to liability for age discrimination can be justified, there was no basis, as a matter of law, for the imposition of punitive damages. Schering claims that the punitive damage award was "based on nothing more than the wildest speculation and conjecture regarding [its] state of mind without a scintilla of proof." Further, Schering asserts that the proofs did not establish that this was an "exceptional case" in which the intentional discrimination—the necessary predicate for liability— was accompanied by evidence of the employer's "state of mind" to reflect either a "malicious" or "evil-minded" intent to discriminate or a "conscious" and "deliberate" disregard of the plaintiff's rights under the statute to warrant a punitive damage award. Schering also contends that even if the issue of punitive damages was properly submitted to the jury, the $8,000,000 award was so excessive as to shock the conscience of the court and plainly represents a manifest denial of justice. Finally, Schering claims that the punitive damage award was the product of improper passion, bias, and prejudice and was against the weight of the evidence.

The LAD permits punitive damage awards. *N.J.S.A.* 10:5–3, in pertinent part, provides:

> The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resul-

tant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. *Such harms have, under common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act* and that this act shall be liberally construed in combination with other protections available under the laws of this State.

[Emphasis added.]

Punitive damages serve a twofold purpose: first, to punish egregious misconduct, and second, to deter the offender and others from repeating it. *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 48–49, 477 *A.*2d 1224 (1984). A necessary precursor to an award of punitive damages is a finding that the offender is guilty of "actual malice." *Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 337, 627 *A.*2d 1081 (1993). As the *Nappe* Court expounded:

> To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act. "The right to award exemplary damages primarily rests upon the single ground—wrongful motive...."
> *Dreimuller v. Rogow,* 93 *N.J.L.* 1, 3 [107 *A.* 144] (Sup.Ct.1919).
> [*Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra,* 97 *N.J.* at 49 [477 *A.*2d 1224] (second omission in original).]

Even though New Jersey has a strong public policy against discrimination that is embodied in the LAD through our Legislature's specific provision for punitive damages in such cases, punitive damages are not automatically available simply on the basis of a LAD violation. Instead, a plaintiff must still show exceptional or outrageous action to recover such damages. As our Supreme Court announced in *Rendine v. Pantzer,* 141 *N.J.* 292, 314, 661 *A.*2d 1202 (1995), to recover punitive damages under the LAD requires "proof that the offending conduct be 'especially egregious.' " (Citation omitted). *See also Weiss v. Parker Hannifan Corp.,* 747 *F.Supp.* 1118, 1135 (D.N.J.1990) ("Like any other case where punitive damages are available, punitive damages should only be awarded under the NJLAD in exceptional cases."); *Catalane v. Gilian Instrument Corp., supra,* 271 *N.J.Super.* at

500–01, 638 *A*.2d 1341 ("We ... agree that punitive damages are only to be awarded in exceptional cases even where the LAD has been violated." (citation omitted)).

Based on the evidence presented in this case, the trial court properly denied defendants' motion for judgment notwithstanding the verdict as to Maiorino's punitive damages claim. The evidence in support of Maiorino's claim and all favorable legitimate inferences to be deduced therefrom was sufficient to submit to the jury the issue of whether the offending conduct was especially egregious to warrant the imposition of punitive damages against Schering.

However, we are convinced that the trial court erred in denying Schering's motion for a new trial as to punitive damages. The punitive damage award must be reversed because the trial court committed plain error when it failed to instruct the jury that Schering's upper management had to be involved in the termination of Maiorino in order to award punitive damages against it. Although Schering did not object to the charge on this precise ground, the failure to charge the jury with the necessity of finding upper management's involvement to justify a punitive award is such a fundamental flaw that we must recognize it as a matter of plain error. *R*. 2:10–2. It is firmly settled that in LAD cases, punitive damages can only be assessed against an employer if there was "actual participation by upper management or willful indifference." *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 625, 626 *A*.2d 445 (1993) (citation omitted). *See also Maczik v. Gilford Park Yacht Club*, 271 *N.J.Super.* 439, 446, 638 *A*.2d 1322 (App. Div.) ("Unlike compensatory damages, punitive damages under LAD can be imputed to an employer or other entity only 'in the event of actual participation by upper management or willful indifference.' " (citation omitted)), *certif. denied*, 138 *N.J.* 263, 649 *A*.2d 1284 (1994). In addition, our Supreme Court has indicated that a jury charge on punitive damages must include the instruction that upper management has to have had participated in or shown willful indifference to the situation. *See Rendine v. Pant-*

zer, *supra*, 141 *N.J.* at 315, 661 *A.*2d 1202 (indicating that a trial court's instruction was proper since it " 'carefully charged the jury that punitive damages could not be assessed against defendant for the acts of his employees, unless defendant himself authorized or directed them, or at least agreed with and acquiesced to them.' " (citation omitted)).

Here, the trial court did not properly instruct the jury that in order for punitive damages to be warranted against Schering, it had to find that Schering's upper management actually participated in or was willfully indifferent to the wrongful discriminatory conduct. The trial court simply did not mention or make any reference in its instructions to the jury that punitive damages could not be assessed against Schering unless its upper management authorized, directed, or at least acquiesced to the conduct. Thus, the charge was legally incorrect and had a clear capacity of producing an unjust result.

Additionally, the punitive damage award must be reversed because it was so excessive as to give rise to a clear inference that the jury verdict was the result of mistake, passion, prejudice, or partiality. The jury's verdict was manifestly outrageous and shocks the conscience of this court. To sustain such an award would result in a manifest denial of justice.

We recognize that juries have discretion in determining the amount of punitive damages to be awarded. Nonetheless, due process requires appellate review of any award for reasonableness. *Herman v. Sunshine Chem. Specialties, Inc., supra*, 133 *N.J.* at 338, 627 *A.*2d 1081 (citing *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 *U.S.* 443, 456–58, 113 *S.Ct.* 2711, 2720, 125 *L.Ed.*2d 366, 376 (1993); and *Pacific Mut. Life Ins. Co. v. Haslip*, 499 *U.S.* 1, 18, 111 *S.Ct.* 1032, 1043, 113 *L.Ed.*2d 1, 20 (1991)). In addition, courts have the power to intervene where such damage awards are grossly excessive and result in a manifest denial of justice. The standard for overturning a punitive damage award was set forth by our Supreme Court in *Leimgruber v. Claridge Associates, Ltd.*, 73 *N.J.* 450, 457, 375 *A.*2d 652 (1977). There, the Court stated:

> This Court has held that verdicts should be upset for being excessive only in clear cases, *Fritsche v. Westinghouse Elec. Corp.,* 55 *N.J.* 322, 330 [261 *A.*2d 657] (1970); that damage awards will not be set aside unless so excessive as irresistibly to give rise to the inference of mistake, passion, prejudice or partiality, *Hager v. Weber,* 7 *N.J.* 201, 213 [81 *A.*2d 155] (1951); or are so disproportionate as to shock the conscience, *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227, 236 [276 *A.*2d 861] (1971); or the sustaining of the award would result in a manifest denial of justice, *id., Sweeney v. Pruyne,* 67 *N.J.* 314, 315 [338 *A.*2d 193] (1975)....
>
> [*Id.* at 457, 375 *A.*2d 652.]

*See also Carey v. Lovett,* 132 *N.J.* 44, 66, 622 *A.*2d 1279 (1993) ("A ... court should not disturb the amount of a verdict unless it constitutes a manifest injustice that shocks the judicial conscience.").

We also are cognizant of the fact that a major difficulty in establishing punitive damages is "the absence of any definitive standard or criterion to guide the trier of fact in determining the proper amount." *Leimgruber v. Claridge Associates, Ltd., supra,* 73 *N.J.* at 456–57, 375 *A.*2d 652. Justice O'Connor of the United States Supreme Court has observed that as a result of the absence of definitive guidelines, punitive damages are "skyrocketing." *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 *U.S.* 257, 282, 109 *S.Ct.* 2909, 2923–24, 106 *L.Ed.*2d 219, 242 (1989) (O'Connor, J., concurring in part and dissenting in part). In fact, Justice O'Connor, in a dissenting opinion in *Pacific Mutual Life Insurance Co. v. Haslip, supra,* 499 *U.S.* at 43, 111 *S.Ct.* at 1056, 113 *L.Ed.*2d at 36, commented that the lack of meaningful standards for punitive damage awards "encourage[s] inconsistent and unpredictable results by inviting juries to rely on private beliefs and personal predilections. Juries are permitted to target unpopular defendants, penalize unorthodox or controversial views, and redistribute wealth. Multimillion dollar losses are inflicted on a whim."

Further, in *Honda Motor Co. v. Oberg,* 512 *U.S.* 415, 432, 114 *S.Ct.* 2331, 2340–41, 129 *L.Ed.*2d 336, 349 (1994), the United States Supreme Court also noted that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts,

and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses...." *See also Ripa v. Owens-Corning Fiberglas Corp.*, 282 *N.J.Super.* 373, 398–99, 660 *A.2d* 521 (App.Div.); *certif. denied*, 142 *N.J.* 518, 665 *A.2d* 1111 (1995).

Accordingly, although punitive damages are not required to be in a "fixed proportional relationship to the amount of compensatory damages[,]" *Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra*, 97 *N.J.* at 50, 477 *A.2d* 1224, our Supreme Court has commanded that punitive damages "bear some reasonable relation to the injury inflicted and the cause of the injury." *Leimgruber v. Claridge Associates, Ltd., supra*, 73 *N.J.* at 457, 375 *A.2d* 652. *See also Herman v. Sunshine Chem. Specialties, Inc., supra*, 133 *N.J.* at 338, 627 *A.2d* 1081. In *Leimgruber v. Claridge Associates, Ltd., supra*, 73 *N.J.* at 456, 375 *A.2d* 652, the Supreme Court set forth factors for the trier of fact to consider in awarding punitive damages:

> In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of damages.
>
> [Citations omitted.]

Application of these principles here compels the conclusion that the trial court erred by denying defendant's motion for a new trial with respect to the punitive damage award. The $8,000,000 award is so excessive as to give rise to the inference of mistake, passion, prejudice, or partiality and so disproportionate to the injury inflicted and the wrong committed as to shock the court's conscience. The evidence of age discrimination, although sufficient to support a verdict in favor of Maiorino under the LAD, was hardly overwhelming. The jury might well have accepted Schering's reasons for terminating Maiorino as real and not pretextual. Moreover, the large compensatory damage award to Maiorino of $435,000 by itself provided significant deterrence even to an employer as large as Schering. An $8,000,000 punitive damage

award was not necessary to ·punish Schering or to deter it and other employers from engaging in the type of conduct found to be discriminatory by the jury here. To sustain such an award would result in a manifest denial of justice. Consequently, the punitive damage award must be reversed and the matter remanded for a new trial on punitive damages.

One final point, on retrial, the trial court should give a limiting instruction that the jury cannot consider the circumstances surrounding Maiorino's firing in the diner in determining whether Maiorino is entitled to punitive damages and, if so, the amount thereof. There was no evidence that terminating Maiorino in the diner was a discriminatory practice. To the contrary, the proofs established that Schering handled the termination of all of its salespersons in this same manner. Maiorino did not offer any evidence to show that this practice was other than standard operating procedure for Schering. Moreover, there is no statutory or common law principle which prohibits an employer from terminating an employee in a public area. Thus, plaintiff's trial counsel should not have made reference to the diner incident in his closing argument on the punitive damages phase of the case when he stated to the jury:

> The purpose of punitive damages are [sic] society's way of punishing a wrong-·doer and deterring or trying to prevent that wrongdoer and others from doing the same wrong in the future.
>
> For example, *in this case we had [the] termination of an older person in a diner. We would prefer not to see that conduct occur again.* And we would prefer that punishment be given that will adequately tell Schering [-]Plough you did wrong, don't do it again.
>
> . . . .
>
> . . . [Y]ou heard a member of the home office testify that *it was their practice to fire people in public places. That's what you're aiming . . . to end.*
>
> [Emphases added.]

Although Schering's trial counsel did not object to these remarks or even request a limiting instruction that the diner incident not be considered by the jury with respect to punitive damages, Maiorino's trial counsel's arguments concerning the incident prejudiced Schering's fundamental right to a fair trial and

undoubtedly led the jury to a result it otherwise might not have reached. Indeed, there seems to be a very strong probability that the jury based its excessive and manifestly outrageous punitive damage award, at least in part, on Schering's termination of Maiorino in the diner. On retrial, this type of comment should not be permitted.

Accordingly, the order of the trial court denying Schering's motion for a new trial as to punitive damages is reversed and the matter is remanded to the trial court for a new trial with respect to punitive damages consistent with the views expressed in this opinion.

## III.

### THE AWARD OF ATTORNEYS' FEES TO MAIORINO

Defendants seek a reversal of the award of attorneys' fees or, alternatively, a reduction in the amount of the fees awarded. Defendants contend that the trial court erred in setting the award of attorneys' fees because (1) Maiorino's attorneys' records were insufficient and vague; (2) Maiorino's attorneys' hourly rates were not reasonable; (3) Maiorino's attorneys' pre-complaint work should have been excluded from consideration in establishing fees; and (4) Maiorino's attorneys spent excessive hours on the case. Maiorino, on the other hand, contends that the trial court did not abuse its discretion in setting the lodestar, but cross-appeals, contending that the trial court erred in not applying a contingent fee enhancer to the lodestar.

Since we have reversed the judgment as to punitive damages and remanded the matter for a new trial on punitive damages, the attorneys' fees awarded in this case must be vacated and the matter also remanded for reconsideration of Maiorino's application for attorneys' fees and costs following the completion of the retrial on punitive damages. Therefore, it is unnecessary for us to reach the issues concerning the award of attorneys' fees and costs raised by defendants and Maiorino on the appeal and cross-appeal,

respectively. We note, however, that if attorneys' fees are awarded on remand, they should be awarded consistent with the principles discussed in *Rendine v. Pantzer, supra*, 141 *N.J.* at 337, 661 *A.*2d 1202.

## IV.

### CONCLUSION

Accordingly, the judgment of the Law Division that awarded Maiorino compensatory damages in the total sum of $435,000 in his age discrimination case under the LAD is affirmed. The judgment that awarded Maiorino punitive damages of $8,000,000 and counsel fees and costs of $396,989.35 against Schering is reversed, and the matter is remanded to the trial court for a new trial as to punitive damages and for reconsideration of Maiorino's application for attorneys' fees and costs following completion of the punitive damages retrial. We do not retain jurisdiction.