**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2013-22

IN THE MATTER OF THE
ESTATE OF PAUL NIGITO,
deceased.

Submitted October 17, 2024 – Decided December 27, 2024

Before Judges Currier, Marczyk, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. P-000218-21.

Giordano, Halleran & Ciesla, PC, attorneys for appellant/cross-respondent Ann Mae Nigito (Michael J. Canning, of counsel and on the briefs).

Albert Buzzetti & Associates, LLC, attorneys for respondents Paul Nigito, Anthony Nigito, TNO2, LLC, and 400 Main Street, LLC, and respondent/cross-appellant Estate of Antoinette Nigito (Steven M. Davis, of counsel and on the briefs).

Sherman Atlas Sylvester and Stamelman LLP, attorneys for respondent Frank Brunetti (Anthony J. Sylvester and Anthony C. Valenziano, of counsel and on the brief).

PER CURIAM

This matter arises from Ann Mae Nigito's (Nigito) challenge to the funding of a generation skipping trust (GST) established by her father, decedent Paul Nigito, under his will. Paul's[1] will created a GST to benefit his wife, Antoinette, during her lifetime; then his daughter, Nigito, during her lifetime; and finally, Nigito's children. After Paul's death in 2001, Antoinette, as executor and co-trustee, refused to fully fund the GST and defunded it entirely before she died. After Nigito sought an accounting of the estate and other related relief following Antoinette's death, the court awarded Nigito the sum that Antoinette should have placed in the GST, plus interest.

Nigito appeals from the damages award, and the court's denial of her request to add a punitive damages count against Antoinette. In a cross-appeal, the Estate of Antoinette Nigito contends the court erred in awarding Nigito counsel fees. After a careful review, we affirm the court's orders with the exception of the denial of Nigito's request for additional attorney's fees in the February 16, 2023 order. Because the court did not provide any reasons for the

---

[1] Since several individuals share a surname, we refer to them by their first names. No disrespect is intended.

denial of the application, we remand on that narrow issue for the court to provide its reasons under Rule 1:7-4(a).

I.

At the time of Paul's death, his estate held nearly $19,000,000 in assets, which included real estate holdings, comprised of some income-producing real properties held in various entities such as "TNO2, LLC" and "Ward Realty O2, LLC."

Article Eighth of the will provided that some of the estate would pass to a GST:

> EIGHTH: This Article Eighth, otherwise referred to as Generation-Skipping Trust, shall be administered and managed by my Trustee, who shall invest and manage the property, and shall make distributions as follows:
>
> A. My Trustees shall hold in trust, upon the following terms and conditions:
>
> 1. To invest and reinvest the same and, from the date of my death, to pay my spouse, the entire income, quarter-annually, including any accrued income at the time of the death of my said spouse. My Trustees, other than my spouse, shall also pay to my said spouse such part or all of the principal as my Trustees (other than my spouse), in their discretion, deem necessary or advisable for my said spouse. My wife shall not have the discretion to distribute principal. The judgment of my Trustees (other than my spouse), as to the amount of such payments or applications of principal and as to the necessity or advisability thereof, shall be final and

conclusive upon all persons interested in the trust and upon making such payments or applications, my Trustees shall be fully released and discharged from all further liability or accountability therefor. In exercising the Trustee's discretion, the Trustee (other than my spouse) may, but shall not be required to take into consideration any other income or property owned by my spouse or that my spouse may (and shall not be required to legally or otherwise) transfer the property distributed to my spouse. Distribution of principal shall be charged to the elected qualified terminable interest trust.

2. My said spouse shall have the right to require that the assets of this trust be income-producing.

3. Notwithstanding the foregoing, if my said spouse (or her personal representative, guardian, agent acting under a power of attorney or the fiduciaries of her estate) shall disclaim my spouse's interest in any part of all of this Trust, then the part of all of this trust over which my spouse has disclaimed my spouse's interest shall pass to Paragraph B of this Article Eighth.

4. Upon the death of my said spouse, or upon my death if my said spouse shall predecease me, my Trustees shall distribute the then balance of this Trust to Paragraph B of Article EIGHTH herein.

The original trustees were Antoinette and Robert Pless.

Article Fourteenth "exculpated" Pless "from any and all liability as a result" of conflicts of interest arising from the administration of the GST and exonerated him "from any liability in connection with the administration of any trust or my estate and if any suit or action is ever brought or initiated against"

him. Article Tenth provided that any "successor trustee shall have the same rights, titles, powers, duties, discretions and immunities and otherwise be in the same position as if originally named trustee."

Article Eighth (B) created a "Sprinkle Trust" upon Antoinette's death. That trust would distribute the GST's income and principal to Nigito, and upon her death, the Sprinkle Trust would distribute the remaining principal to Nigito's descendants. Article Ninth of the will required the trustees to "maximize the amount of trust property that eventually may be distributed to my grandchildren or more remote descendants without transfer tax of any kind."

Under Article Fourth, Antoinette was directed, as executor, "to set aside an amount equal to the balance of" the GST. At the time of Paul's death, that amount was $1,060,000.

Prior to Antoinette's death, the only funds contributed to the GST came from TNO2, LLC, which held a 50% ownership interest in real property on Essex Street in Hackensack (the Essex property). The Essex property produced rental income of approximately $227,000 a year, and was appraised in 2008 with a valuation of $1.3 million. Therefore, in March 2009, Pless calculated the GST had $650,000 in funds—50% share of the Essex property's $1.3 million valuation.

A-2013-22

Later that year, Pless advised Antoinette's accountant that the GST was short of its "initial obligation of $1,060,000" because it held only $650,000. He requested the accountant "coordinate" with Antoinette "on the appropriate assets to complete the funding." Over the next year, Pless continued to request the accountings for the GST, advising the accountant the GST "must be completely funded."

In July 2010, Antoinette wrote to Pless stating:

> I want to close as soon as possible the funding of the [GST].
>
> I believe the 10 years is soon upon me. I want to fund the trust with the following properties:
>
> > (1) Increase the percentage of ownership as follows:
> >
> > > (A) Ward Realty
> > >
> > > (B) Wagner Place Associates
>
> Once this has been completed then my Husband's Estate will be closed, and all the requirements of the estate have been satisfied under his will and that all of the properties be transferred over to me.
>
> After the above has been completed, please arrange to make these transfers as soon as possible.

A-2013-22

Pless responded:

> I believe that it has been approximately seven (7) years that I have been trying to coordinate the funding of the Trust and never believed this amount of time should have elapsed without the funding being accomplished. With that said, we should assess the value of Ward Realty . . . LLC, which is owned by [Paul's estate]. Once we know the value we can determine the percent to transfer to the . . . [GST].
>
> I note that you reference Wagner Place Associates ("Wagner") in your letter. Wagner is currently owned by TNO2, LLC. The [GST] owns one hundred (100%) percent of TNO2, LLC. Wagner had been transferred, via TNO2, LLC to the Trust.

The next month, Pless wrote another letter to Antoinette that TNO2, LLC must "distribute all rental income (not principal) to the" GST, which would then distribute all rental income to her. Antoinette responded that she desired "to move forward, and would like to have this closed by the end of" the month. Pless responded that he and Antoinette needed to discuss "the percent in Ward Realty O2, LLC that will be assigned to the" GST.

Pless ultimately resigned as trustee. He appointed Frank Brunetti and Anthony Guidetti as his successors. Prior to his resignation, Pless sought "a final accounting on the" trusts for which he had served as trustee. Brunetti suggested that Pless, instead, "waive the final accounting" and obtain a "complete [r]elease" from the GST's beneficiaries.

7

In February 2011, Brunetti advised Pless that the GST had been "partially funded on March 1, 2009 in the amount of $650,000 and had a value as of June 30, 2010 of $649,817." Brunetti stated he did not understand "the nature of the funding."

Thereafter, Brunetti told Antoinette he wanted to "finish funding the [GST] and close the estate." He elaborated:

> As Mr. Pless has resigned as Trustee of the Trusts under your husband's Last Will and Testament, and as he has appointed myself and Anthony Guidetti in his stead, we are in a position to fund the [GST] and close the Estate. With respect to Ward Realty, which I understand we are going to use to fund the [GST], do you have an appraisal of Ward Realty which I can work from to compute the percentage of ownership that must be transferred into the Trust. We will fund the Trust by transferring over the Estate's interest or a portion thereof with the remainder, if any, being transferred to you.

Thereafter, Brunetti told Antoinette and a new accountant that the GST was "underfunded," stating:

> According to the memorandum provided by Mr. Pless, the Trust was funded with 50% of Wagner Place at a value of $650,000 on March 1, 2009. The Trust must be funded with an additional $350,000 of value. Before I became involved, Mr. Pless and the former accountant were talking about funding it with Ward Realty. We need to fund the Trust with $350,000 of value of whatever entity Antoinette chooses. It could be Ward Realty, but whichever it is we need a valuation so that

A-2013-22

we can determine the percentage that gets transferred into the Trust.

A month later, Brunetti told Antoinette that if she wished to remove TNO2, LLC as the GST's only source of funds, she would "need to have a current appraisal showing the current value of the property and then replace it with an identical amount of property so that the Trust is not adversely affected by the exchange of properties." Thereafter, Brunetti wrote a memorandum for his own files stating that Ward Realty would not contribute funds to the GST and, instead, two other "parcels of property" would do so.

In October 2011, Brunetti wrote another memorandum, stating that Antoinette advised him the GST was fully funded or "perhaps overfunded" because the Essex Property was "valued at $3 million" and due to GST's fifty percent ownership, it was funded in the amount of $1,500,000. He noted that Antoinette would not transfer any other assets into the GST. A June 2013 appraisal valued the Essex property at $1,575,000, not $3 million.

In 2015, Antoinette transferred TNO2, LLC's interest in the Essex property to another LLC whose only member was Antoinette. TNO2, LLC's interest in the Essex property was the only asset in the GST. The GST was never re-funded.

## II.

Antoinette died in September 2019.  Thereafter, Nigito filed a verified complaint against the Estates of Antoinette and Paul, two business entities operated by Antoinette (defendants collectively), and Brunetti.  The complaint sought an accounting of the GST; imposition of a constructive trust on the Essex property; and causes of action for breach of fiduciary duty against Brunetti and Antoinette.  Brunetti filed a third-party complaint against Pless.

Nigito moved for summary judgment and for leave to amend the verified complaint to add a count for punitive damages.  Defendants cross-moved for summary judgment.

On November 17, 2022, the court entered an order granting Nigito partial summary judgment and dismissing Pless from the case.  The court ordered Antoinette's estate to pay Nigito $1,060,000 plus 6.8% statutory interest running from the date of Antoinette's death and awarded Nigito attorney's fees.  The court denied Nigito's request to hold Brunetti personally liable "for lost principal and income of the GST," but ordered his removal as a trustee and that he was not entitled to any commissions.  The court also denied Nigito's application to amend the complaint to add a count for punitive damages.

A-2013-22

In its oral decision, the court found it was undisputed the GST "should have been funded," but an issue remained as to whether those funds should have come from income-producing real property. The court reviewed the language of Articles Fourth and Eighth, noting it was unclear where those funds would come from, "if not th[o]se properties." But the court also noted Pless's testimony that "it was not Paul['s] . . . intent to require that real property . . . be used to fund the GST," and the court found Pless's testimony to "have some validity." The court concluded the will, by its language, provided "a considerable amount of discretion" as to how to fund the GST, and did not specify that its funding must come from real property.

In sum, the court stated:

> One could sit back and say would've, should've, could've, that if she had done what she was supposed to do, you could argue it would be likely that it would have been th[o]se properties. And if they had stayed there, they would have appreciated.
>
> But to go back and say that is the only thing that could have happened and should have happened, I just can't find.
>
> Because there was a considerable amount of discretion that was placed in this.
>
> The decedent expressly gave Antoinette the discretion to fund some income-producing property or not. . . .

11

> That means what it says, that she will have the right to require that they be income producing, which obviously to this Court, is clear that if she has the right to require that the assets of the trust be income producing, she also has the right not to.

The court noted that, under the language of the will, Antoinette "could have put [$1,060,000] in there" and "let it sit."

Subsequently, Nigito moved for reconsideration of the November 17, 2022 order and for attorney's fees. Nigito contended the court erred in not imposing a constructive trust on the Essex property and in not awarding her the substantial profit that would have been realized if Antoinette had properly funded the GST. Defendants cross-moved for reconsideration of the attorney's fees award.

In its oral decision regarding Nigito's motion for reconsideration, the court analyzed her arguments under the Prudent Investor Act (Act), N.J.S.A 3B:20-11.1 to -11.12, and found them without merit. The court stated it looked "to the language" and "the intent" of the will in the context of the Act. The court reiterated its prior finding that Article Eighth required the trustees to invest money in the GST, pay Antoinette "the entire income," and that Antoinette had "the right to require that the assets of the Trust be income producing," but did not have to do so.

12

The court determined its findings were consistent with Paul's probable intent, as evidenced by a letter he wrote indicating Antoinette should invest "in some conservative stocks" rather than real estate. The court concluded "the GST should have been funded in the amount of [$1,060,000] with interest accruing at 6.8 percent since September of 2019, which was the date of [Antoinette's] death."

The court also denied the cross-motion, concluding fees were warranted as Nigito had to seek relief from the court stemming from Antoinette's refusal to fund the GST. The decisions were memorialized in a February 16, 2023 order.

## III.

On appeal, Nigito challenges the award of damages, arguing the court erred in not compelling Antoinette's estate to fund the GST with income from Paul's real property, which would have increased the GST's payouts to Nigito. She also contends Paul wrote a note to Antoinette which stated Nigito would receive $1,000,000 in income from Paul's real properties following his death. Nigito further asserts it was error not to impose a constructive trust on Paul's real property to fund the GST.

We review a trial court's factual findings under a deferential standard. Balducci v. Cige, 240 N.J. 574, 595 (2020). Factual "findings by [a] trial court

are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## A.

This court's function is "to construe" rather than rewrite a testator's will. In re Est. of Schumann, 125 N.J. Super. 56, 65 (App. Div. 1973) (quoting In re Schmidt, 46 N.J. Super. 369, 381 (App. Div. 1957)). Courts confine their analyses of a will to "the four corners of the document and the language therein . . . ." In re Tr. Under Agreement of Vander Poel, 396 N.J. Super. 218, 226 (App. Div. 2007).

However, if the language in a will is ambiguous, the testator's probable intent becomes the lodestar that guides its construction. In re Est. of Dawson, 136 N.J. 1, 9 (1994). The probable intent doctrine permits a court to consider a will's language "in light of the surrounding facts and circumstances" and effectuate the testator's "dominant plan and purpose as they appear from the

14

entirety of" the written instrument. In re Est. of Flood, 417 N.J. Super. 378, 383 (App. Div. 2010) (quoting Fidelity Union Tr. Co. v. Robert, 36 N.J. 561, 564-65 (1962)). This may include consideration of "the circumstances surrounding its execution and other extrinsic evidence of intention." Vander Poel, 396 N.J. Super. at 226 (citing In re Est. of Payne, 186 N.J. 324, 335 (2006)). "To be sure, the testator's own expressions of his or her intent are highly relevant. Once the evidence establishes the probable intent of the testator, 'the court may not refuse to effectuate that intent by indulging in a merely literal reading of the instrument.'" Payne, 186 N.J. at 335 (citations omitted).

Our review of the plain language of Paul's will supports the court's determination that Antoinette's estate was not required to use income-producing real property to fund the GST. Under Article Eighth (A)(2), Antoinette was given the right to require that the assets of the GST be income producing. However, this language did not compel her to fund the GST with income-producing properties, but rather vested her with a right to take that course of action. This implied she had a cognate right not to do so. See Black's Law Dictionary 1946 (11th ed. 2019) (defining the legal maxim affirmativum negativum implicat, that an "affirmative implies a negative").

The will gave Antoinette the power to decide. Therefore, compelling her estate to use the real properties for funding the GST would ignore the will's clear language. Since the plain language of the will supports the court's conclusion, we need not undertake a probable intent analysis. Even if we were to do so, Nigito cannot satisfy her burden of proving Paul intended to fund the GST with real property.

Pless repeatedly testified that Paul did not instruct him to fund the GST with "specific properties." Pless stated that Paul only specified that the GST should hold $1,060,000 in funds at the time of his death. Pless testified it was Paul's intent to leave Nigito the $1,060,000 in the GST.

Brunetti, too, testified that Paul intended to fund the GST in the amount of $1,060,000. But when asked whether he understood that "Paul's intent was to fund the GST with income producing property," Brunetti responded that he understood only "the amount of money" to be placed in the GST.

Nigito relied on Paul's handwritten note to Antoinette. It stated: "The first million that we will pass on to [Nigito] and the kids should consist of properties at 64 Prospect, Beverly Road Teaneck, lots in Hillsdale and the apt in Bogota if you need it to make up the million in assets." When asked about the "first million," Pless testified that Paul only told him to put "the million dollars

[in the GST]," and that Paul didn't tell him about "specific properties or [Pless] would have drafted the will that way."

This note does not support Nigito's assertion because it suggests only that Antoinette use real property if she could not find funds elsewhere in the estate. Paul's federal estate tax return showed the estate held nearly $2.5 million in stocks, an amount well in excess of the $1,060,000 required to fund the GST. As the trial court found, this handwritten note was persuasive in determining "there was a considerable amount of discretion" given to Antoinette regarding how to fund the GST. Therefore, we see no reason to disturb the court's finding that Antoinette's estate was not required to fund the GST with real property.

B.

We turn then to Nigito's arguments regarding the amount of the damages award. She contends the trial court erred by awarding her only $1,060,000, because had the GST been funded with income from Paul's real properties, the GST would have produced greater income. Nigito further asserts Antoinette's failure to take this course of action violated her fiduciary duties and the Act.

A trustee has a fiduciary relationship with a trust. In re Niles Tr., 176 N.J. 282, 297 (2003). A trustee's duties "depend primarily upon the terms of the trust." MacKenzie v. Reg'l Principals Ass'n, 377 N.J. Super. 252, 264 (Ch. Div.

17

2004) (citing Branch v. White, 99 N.J. Super. 295, 306 (App. Div. 1968)). In general, however, those who serve as an "executor or trustee plainly owe a fiduciary duty to the beneficiaries of the estate or the trust." In re Est. of Folcher, 224 N.J. 496, 511 (2016).

"The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty," which prevents the trustee from administering the trust in a way that militates toward the trustee's benefit and the beneficiaries' detriment. In re Est. of Koretzky, 8 N.J. 506, 528-29 (1951) (collecting cases); see also In re Gloria T. Mann Revocable Tr., 468 N.J. Super. 160, 172 (App. Div. 2021) (providing trustees must "invest and manage the trust assets solely in the interest of the beneficiaries" (quoting N.J.S.A. 3B:20-11.5)). A trustee bears similar duties to a trust's remaindermen, if any, and must not use the trust property to benefit only "the life beneficiaries." In re Will of Maxwell, 306 N.J. Super. 563, 585-86 (App. Div. 1997) (collecting authorities).

Trustees are further subject to the requirements set forth in the Act, which "expresses a standard of conduct, not outcome," for a trust's fiduciaries, and compliance "is determined in light of the facts and circumstances existing at the time of the fiduciary's decision or action." Gloria T. Mann Revocable Tr., 468 N.J. Super. at 173 (quoting N.J.S.A. 3B:20-11.9). Under the Act, fiduciaries

18

must "invest and manage trust assets as a prudent investor would," including by exercising "reasonable care, skill, and caution" in handling those assets according to "the purposes, terms, distribution requirements, and other circumstances of the trust." Id. at 172 (quoting N.J.S.A. 3B:20-11.3(a)). To that end, the Act enumerates "circumstances that the fiduciary shall consider in investing and managing trust assets." N.J.S.A. 3B:20-11.3(d)(1)-(8).

With these circumstances in mind, trustees are duty bound "to preserve the trust property" and "make it productive so" the beneficiaries receive "a reasonable income." Gloria T. Mann Revocable Tr., 468 N.J. Super. at 172 (quoting Pa. Co. for Ins. on Lives v. Gillmore, 137 N.J. Eq. 51, 58 (Ch. 1945)). But the trustee's concern "is not with increasing an estate." Id. at 173 (quoting 7 N.J. Practice, Wills and Administration § 987, at 31 (Alfred C. Clapp & Dorothy G. Black) (rev. 3d ed. 1984)). The law does not expect a trustee "to take risks for the purpose of increasing the principal or income." Com. Tr. Co. of N.J. v. Barnard, 27 N.J. 332, 343 (1958) (quoting 2 Scott on Trusts § 227.3, at 1203 (1939)). Rather, the trustee is expected only to preserve the trust property and provide beneficiaries with "a regular income." Gloria T. Mann Revocable Tr., 468 N.J. Super. at 172-73.

These foregoing principles may be eliminated or "altered by express provisions of the trust instrument," and a "fiduciary is not liable to a beneficiary to the extent that the fiduciary acted in reasonable reliance on those express provisions." Id. at 172 (quoting N.J.S.A. 3B:20-11.2(b)).

Paul's will did not eliminate or alter these well-established principles. Its command was simple: the trustees were to fund the GST in the amount of $1,060,000. As discussed, the will gave Antoinette discretion as to where those funds were to originate, and it contained no instruction to invest the principal so it would grow from that original amount.

Nigito seeks to extend either the terms of the will or the duties of trustees under the Act, asserting that a prudent investor would have funded the GST to maximize the principal which would ultimately fall to the remaindermen. However, neither the case law nor the Act imposes those requirements. The trustees were compelled to preserve the $1,060,000 that should have been placed in the GST and to let it provide a reasonable income to the GST's beneficiaries. They were not required to arrange for any beneficiary to receive an increased or maximized payout beyond that provided by the initial funding obligation.

Nigito also construes Article Ninth to direct the trustees to "maximize the amount of trust property that eventually may be distributed to" the

remaindermen. We are unconvinced. Article Ninth directed the trustees "to avoid or delay generation-skipping tax when making discretionary distributions, and to maximize the amount of trust property that eventually may be distributed to" the remaindermen "without transfer tax of any kind." Therefore, Article Ninth directed the trustees to limit the tax obligations of Paul's estate in winding up any of the trusts created under Paul's will. It was not a command to create the largest possible income for the GST's remaindermen and did not modify any of the trustees' obligations under the Act.

We discern no error in the court's decision to award Nigito damages in the amount of the GST's initial funding obligation, because neither the will nor the Act required the GST's trustees to maximize the GST's principal or income beyond that initial obligation.

## C.

Nigito asserts the court erred by declining to void Antoinette's transfer of the Essex property to herself and impose a constructive trust, in effect transferring the property to the GST. As stated, the court found Antoinette was not required to fund the GST with real property. Therefore, the court concluded that "to transfer title to" the Essex property through a constructive trust "would be contrary to the provisions of the will." We agree.

We review the denial of an equitable remedy for an abuse of discretion. Sears Mortg. Corp. v. Rose, 134 N.J. 326, 354 (1993). Chancery judges have broad discretionary powers to adapt equitable remedies to the particular circumstances of a case. Kaye v. Rosefielde, 223 N.J. 218, 231 (2015). "A court abuses its discretion when its 'decision is "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis."'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)). A "functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." R.Y., 242 N.J. at 65 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

A constructive trust is an equitable remedy by which a court prevents unjust enrichment and compels the restoration of property that "in good conscience [does] not belong to the defendant." Flanigan v. Munson, 175 N.J. 597, 608 (2003) (alteration in original) (quoting Dan B. Dobbs, Remedies § 4.3, at 241 (1973)). "When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts" that holder "into a trustee." Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016) (quoting Carr v. Carr, 120 N.J. 336, 351 (1990)). "In

22

that circumstance, the court of equity" requires the holder to "account for the res in whatever manner the court deems fair and just."  Thompson v. City of Atl. City, 386 N.J. Super. 359, 376 (App. Div. 2006).

To impose the remedy, a plaintiff must demonstrate proof of a wrongful act which resulted in an unjust enrichment.  Flanigan, 175 N.J. at 608.  This two-prong test requires proof "by clear, definite, unequivocal and satisfactory evidence."  Massa v. Laing, 160 N.J. Super. 443, 446-47 (App. Div. 1977) (quoting Gray v. Bradley, 1 N.J. 102, 104 (1948)).  Our Supreme Court has cautioned "that a constructive trust is a powerful tool to be used only when the equities of a given case clearly warrant it."  Flanigan, 175 N.J. at 611.

With respect to wrongful acts, our law expansively permits a showing of "fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property."  D'Ippolito v. Castoro, 51 N.J. 584, 589 (1968).  The acquisition or retention of property "in violation of a fiduciary duty" may constitute a wrongful act.  Hyland v. Simmons, 152 N.J. Super. 569, 575 (App. Div. 1977) (citing D'Ippolito, 51 N.J. at 588).

With respect to unjust enrichment, the plaintiff "must demonstrate that the opposing party 'received a benefit and that retention of that benefit without payment would be unjust.'"  Thieme, 227 N.J. at 288 (quoting Iliadis v. Wal-

Mart Stores, Inc., 191 N.J. 88, 110 (2007)). "The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich" themselves "unjustly at the expense of another." Goldsmith v. Camden Cnty. Surrogate's Off., 408 N.J. Super. 376, 382 (App. Div. 2009) (quoting Assocs. Com. Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986)).

Here, the court decided to fashion a different remedy in lieu of imposing a constructive trust. It ordered Antoinette's estate to fund the GST in the amount of $1,060,000 plus statutory interest that should have been paid upon Antoinette's death. This remedy was consistent with the court's holding that Article Eighth did not require the trustees to fund the GST with real property, but instead leaving the source of the funding to the trustees' discretion. To impose a constructive trust on real property would contravene the intent behind Article Eighth. We are satisfied the court did not abuse its discretion in its decision not to impose a constructive trust.

## D.

Nigito asserts the court erred by awarding damages running only from Antoinette's death in September 2019, rather than from Paul's death in 2001. According to Nigito, the court's award failed to make the GST and its beneficiaries whole, and rewarded Antoinette's estate "for her breaches of

fiduciary duty" because it deprived the GST of income and appreciation in value which would have been paid to beneficiaries following Antoinette's death. Nigito contends the court should have funded "the GST with a value of $1,060,000 as of 2001" and "impose[d] liability on Antoinette's Estate for the profit made by reason of Antoinette's breach."

Nigito also asserts she is entitled to greater damages because the trustees "failed woefully in their obligations to inform [her] of the delay in funding the GST, the partial funding of the GST in 2009, and the defunding of the [GST] in 2015."

The court stated "the measure of damages [was] to put [Nigito] in the position she would have been in if the GST had been funded. Not necessarily a position she would have been in if it was somehow done in the manner which would have been in the greatest benefit to her, but if it had been funded." The court concluded, to be made whole, the GST needed to be fully funded in the amount of $1,060,000 with 6.8% "statutory interest that should have been paid upon Antoinette['s] death on September 22[], 2019."

Again, "a judge sitting in a court of equity has a broad range of discretion to fashion the appropriate remedy in order to vindicate a wrong consistent with

principles of fairness, justice, and the law." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999).

A "violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." N.J.S.A. 3B:31-71(a). Furthermore, a

> trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of: (1) the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) the profit the trustee made by reason of the breach.
>
> [Gloria T. Mann Revocable Tr., 468 N.J. Super. at 177-78 (quoting N.J.S.A. 3B:31-72(a)).]

Under Article Eighth (A)(1), Antoinette was to receive the GST's entire income and as much of the principal as the trustees, other than herself, deemed necessary. The will did not provide for Nigito or her descendants to receive any income or principal until Article Eighth (B) created the Sprinkle Trust upon Antoinette's death. Therefore, there is no evidence to support Nigito's argument that she was entitled to payments from the GST until Antoinette died. The court did not err in concluding that Antoinette's death was the proper date to begin calculating Nigito's damages.

Nigito, seeking a greater damages award, argues that Antoinette's breach caused the GST to lose profits. See N.J.S.A. 3B:31-72(a) (entitling the

beneficiary to "the profit the trustee made by reason of the breach," if that is greater than "the amount required to restore the value of the trust property" to what it would have been but for the breach).  This argument arises from her contention that income from real property should have funded the GST, and thus the GST suffered because Antoinette deprived it of that income.  Since we have concluded that the will did not require the funding of the GST come from real property, we need not discuss this contention further.

E.

Nigito contends the court erred by declining to hold Brunetti personally liable despite the exculpatory language in Paul's will which applied to Brunetti. Nigito argues instead, that Brunetti breached several fiduciary duties when he permitted Antoinette's defalcations, failed to restore the GST's assets after it had been defunded, and failed to notify her of "material developments relating to the GST."  Accordingly, Brunetti acted "with reckless indifference with regard to the administration of the GST" and, therefore, the exculpatory clauses in the will do not shield him from personal liability.

In considering this argument, the court noted Paul's will included exculpatory clauses directed toward the trustees.  It also found Brunetti "had a conflict" because, although he "was trying to do what should have been done"

with the GST, Antoinette "wasn't doing what she was supposed to do." The court stated:

> With regard to Mr. Brunetti, again, you know, he had a lot on his plate. . . .
>
> The [c]ourt expressed a lot of displeasure as to . . . [Brunetti] being a trustee, a co-trustee with somebody who is not listening, not doing what they are supposed to do, and then representing the estate and so forth.
>
> Perhaps he should have removed himself in that situation; the trustee could resign, or they could take action.
>
> But the issue, is, does his conduct rise to the standards. And again, it is not necessarily black and white, but gray and fact specific where, you know, he should be held liable.
>
> You are saying to the extent that Antoinette Nigito fails to satisfy any judgment, Mr. Brunetti may be surcharged for the lost principal and income of the GST due to the defunding of the GST.
>
> I don't agree with that. I think the Estate of Antoinette Nigito needs to be responsible for this judgment. And will be.
>
> I think Mr. Brunetti had some conflict, perhaps. Again, action should have been taken, but the wrong has been corrected now, and I don't think it rises to the level where he should be expected to pay out of his pocket.
>
> And, again, it is a fine line in his case, but we look at these clauses.

And I think it was intended that the [trustees] be protected, probably from Antoinette.

We again review this determination for an abuse of discretion. <u>Gloria T. Mann Revocable Tr.</u>, 468 N.J. Super. at 177 (citing <u>Graziano</u>, 326 N.J. Super. at 342).

Nigito relies on the <u>Restatement (Third) of Trusts</u> and N.J.S.A. 3B:31-72 to support her argument. The <u>Restatement</u> provides that "if two or more trustees are liable for a breach of trust, they are jointly and severally liable, with contribution rights and obligations between or among them reflecting their respective degrees of fault." <u>Restatement (Third) of Trs.</u> § 102 (Am. L. Inst. 2024). N.J.S.A. 3B:31-72 provides, in general, that

> if more than one trustee is liable to the beneficiaries for a breach of trust, a trustee is entitled to contribution from the other trustee or trustees based on the comparative degree of culpability for the breach. However, a trustee who committed the breach in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries is not entitled to contribution from a trustee who was not guilty of such conduct. A trustee who received a benefit from the breach of trust is not entitled to contribution from another trustee to the extent of the benefit received.

However, Paul's will contained exculpatory clauses that shielded Brunetti from personal liability in this matter. Article Fourteenth "exculpated" Pless, the original trustee, "from any and all liability as a result" of conflicts of interest

29

connected to the GST and exonerated him "from any liability in connection with the administration of any trust or my estate if any suit" was brought against him. Article Tenth provided that any "successor trustee shall have the same rights, titles, powers, duties, discretions and immunities and otherwise be in the same position as if originally named trustee."

N.J.S.A. 3B:31-77 provides:

> a. A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that it:
>
> (1) relieves the trustee of liability for breach of trust committed in bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries; or
>
> (2) was inserted as the result of an abuse by the trustee of a fiduciary or confidential relationship to the settlor.
>
> b. An exculpatory term drafted or caused to be drafted by the trustee is invalid as an abuse of a fiduciary or confidential relationship unless the trustee proves that the exculpatory term is fair under the circumstances and that its existence and contents were adequately communicated to the settlor.

There is no evidence that Brunetti, who succeeded Pless long after Paul died, had any hand in drafting the will. Therefore, N.J.S.A. 3B:31-77(b) is inapplicable to Brunetti.

Consequently, Nigito can circumvent the exculpatory clauses only if she shows Brunetti acted in "bad faith or with reckless indifference to the purposes of the trust or the interests of the beneficiaries." N.J.S.A. 3B:31-77(a)(1). Nigito only refers to the "reckless indifference" prong of N.J.S.A. 3B:31-77(a)(1) and does not argue Brunetti acted in bad faith.

There is no case law interpreting N.J.S.A. 3B:31-77, including what it means for a trustee to be recklessly indifferent. In other contexts, our Court has defined reckless conduct as a degree "of civil culpability greater than gross negligence" including a "'conscious disregard . . . to a known or obvious risk of harm to another.'" Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 365-66 (2016) (omission in original) (quoting Anderson v. Massillon, 983 N.E.2d 266, 273 (Ohio 2012)). See also Schick v. Ferolito, 167 N.J. 7, 19 (2001) (defining reckless conduct as "an extreme departure from ordinary care, in a situation in which a high degree of danger is apparent.").

Here, the court found Brunetti's efforts to fund the GST were thwarted by Antoinette. As the record reflects, between February 11 and June 21, 2011, Brunetti sent several letters to Antoinette beseeching her to cooperate in funding the GST, which he consistently communicated was underfunded. That correspondence resulted in a plan to transfer two real properties to the GST, but

31

Antoinette reneged on the plan because she believed she had no further obligation to the GST. The court also found that Antionette's estate had the assets to fund the Sprinkle Trust, which would benefit Nigito and her descendants upon Antoinette's death.

We discern no error in the court's application of the exculpatory clauses and its finding that Brunetti did not act with reckless indifference to the GST's remaindermen. Brunetti consistently attempted to resolve the GST's issues in a cooperative manner, without resorting to litigation or the removal of Antoinette from a trust intended for her benefit during her lifetime. Moreover, there did not appear to be a high risk of harm to the remaindermen, given that they were not entitled to income from the GST until Antoinette's death created the Sprinkle Trust, and that Antoinette's estate held enough assets to fund that trust.

As to Nigito's contention that she was injured by Brunetti's failure to keep her informed of activity related to the GST, "N.J.S.A. 3B:31-67(a) requires '[a] trustee [to] keep the qualified beneficiaries of the trust reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests.'" Gloria T. Mann Revocable Tr., 468 N.J. Super. at 179 (alterations in original) (quoting N.J.S.A. 3B:31-67(a)). In Gloria T. Mann Revocable Trust, however, this court declined to award damages for a trustee's

failure to keep a beneficiary reasonably informed because the beneficiary did not show how the failure "resulted in any loss" and "the trial court compensated" the beneficiary for the trustee's "self-distribution."  Ibid.

This case is similar.  Nigito has not shown how Brunetti's failure to communicate with her resulted in any loss to her, and the court has compensated Nigito for Antoinette's self-distribution by funding the Sprinkle Trust from Antoinette's estate.

F.

Nigito next contends the court erred in denying her motion for leave to amend her complaint to insert a claim for punitive damages against Antoinette.

We review the "trial court's decision to grant or deny a motion to amend the complaint for abuse of discretion."  Port Liberte II Condo. Ass'n v. New Liberty Residential Urb. Renewal Co., 435 N.J. Super. 51, 62 (App. Div. 2014).

Rule 4:9-1 provides that

> [a] party may amend any pleading as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is to be served, and the action has not been placed upon the trial calendar, at any time within 90 days after it is served.

Where a litigant seeks to amend a complaint beyond the period in which amendment is "still a matter of right," the litigant must receive "leave of court"

33

to do so. <u>Notte v. Merchs. Mut. Ins. Co.</u>, 185 N.J. 490, 500-01 (2006) (quoting <u>R.</u> 4:9-1). "'<u>Rule</u> 4:9-1 requires that motions for leave to amend be granted liberally' and that 'the granting of a motion to file an amended complaint always rests in the court's sound discretion.'" <u>Id.</u> at 491 (quoting <u>Kernan v. One Wash. Park Urb. Renewal Assocs.</u>, 154 N.J. 437, 456-57 (1998)).

"In exercising that discretion, a court must go through 'a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile.'" <u>Grillo v. State</u>, 469 N.J. Super. 267, 275 (App. Div. 2021) (quoting <u>Notte</u>, 185 N.J. at 501). "The court determines whether the proposed amendment would be futile by asking 'whether the amended claim will nonetheless fail and, hence, allowing the amendment would be a useless endeavor.'" <u>Id.</u> at 275-76 (quoting <u>Notte</u>, 185 N.J. at 501). The court makes this analysis "in light of the factual situation existing at the time" of the motion. <u>Notte</u>, 185 N.J. at 501 (quoting <u>Interchange State Bank v. Rinaldi</u>, 303 N.J. Super. 239, 256 (App. Div. 1997)).

A plaintiff may seek an award of punitive damages under the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17. <u>In re Est. of Stockdale</u>, 196 N.J. 275, 308 (2008). "An award of punitive damages must be specifically

prayed for in the complaint." Gloria T. Mann Revocable Tr., 468 N.J. Super. at 178 (quoting N.J.S.A. 2A:15-5.11).

To prevail on the award, a plaintiff must prove, "by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S.A. 2A:15-5.12(a). "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such an act or omission." N.J.S.A. 2A:15-5.10. "'Actual malice'" means "an intentional wrongdoing in the sense of an evil-minded act." Gloria T. Mann Revocable Tr., 468 N.J. Super. at 178 (quoting N.J.S.A. 2A:15-5.10).

The PDA also provides a non-exhaustive list of factors "the trier of fact shall consider" in analyzing a claim for punitive damages, including:

> (1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
>
> (2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

[N.J.S.A. 2A:15-5.12(b)(1)-(4).]

Case law specifies that conduct may give rise to punitive damages only when it is "exceptional or outrageous" and "especially egregious." Saffos v. Avaya, Inc., 419 N.J. Super. 244, 263 (App. Div. 2011) (first quoting Maiorino v. Schering-Plough Corp., 302 N.J. Super. 323, 353 (App. Div. 1997); and then quoting Rendine v. Pantzer, 141 N.J. 292, 314 (1995)).

"Mere negligence, even if gross, is generally held insufficient" to sustain the award of punitive damages for the breach of a fiduciary duty. Albright v. Burns, 206 N.J. Super. 625, 635 (App. Div. 1986) (citing Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 50 (1984)); see also N.J.S.A. 2A:15-5.12(a) ("This burden of proof may not be satisfied by proof of any degree of negligence.").

The court denied Nigito's application for leave to amend her complaint to add a count for punitive damages because it found she failed to prove, by clear and convincing evidence, that Antoinette acted with "actual malice" or "a wanton and willful disregard of persons who foreseeably might be harmed by"

her acts or omissions. The court stated it gave "careful and extensive consideration of each factor" in the PDA and found Nigito failed to satisfy them.

The facts show Antoinette received several letters from the trustees advising that the GST was underfunded. Nevertheless, Antoinette contended she believed the GST was in fact overfunded. She repeatedly expressed a desire to wind up Paul's estate and "close as soon as possible the funding of the '[GST]'" despite the trustees' advice that she had not taken the necessary steps to do so.

From these facts, Nigito seeks to impute malice or a willful disregard of harm onto Antoinette. We are unpersuaded. The record lacks affirmative proof that Antoinette was evil-minded or knew there would be a high degree of harm to Nigito when she ignored the advice of her co-trustees. At most, the facts demonstrate a degree of negligence in Antoinette's activities as trustee: the parties showed she ignored or misunderstood her obligations to the GST. These facts do not satisfy a claim of punitive damages extending from a breach of fiduciary duty.

Therefore, the court did not abuse its discretion in denying Nigito leave to amend the complaint to include a claim for punitive damages because the claim would have been futile. Nigito did not produce proof of Antoinette's evil-

mindedness or knowledge of a high degree of harm to Nigito arising out of her breach of fiduciary duties.

G.

Nigito argues the court erred in declining to award her attorney's fees after October 31, 2022. She contends she submitted an affidavit from counsel tabulating fees incurred through October 31, 2022, which the court granted, but then the court improperly refused to permit her to supplement counsel's affidavit with a tabulation of fees incurred after October 31, 2022. Nigito seeks a remand for the court "to determine the amount of fees to be awarded" following October 31, 2022.

In its oral decision, the court found an award of attorney's fees to Nigito was "clearly warranted." The corresponding November 17, 2022 order stated the "quantum of fees and costs will be handled by post-judgment application."

In December 2022, Nigito's counsel filed an affidavit of services for its services performed through October 31, 2022. In its February 16, 2023 order denying Nigito's motion for reconsideration in its entirety, the court granted Nigito $340,765.17 for attorney's fees and costs incurred through October 31, 2022. The order denied Nigito's request to submit an additional affidavit of services for fees and costs incurred after October 31, 2022. The request for

additional fees and costs was not raised by plaintiff's counsel during the February 16 oral argument and the court did not provide any reasons in the order for denying the request.

Presumably the court did not award additional fees because Nigito did not prevail on her motion for reconsideration, in which case the discussion below regarding the fund in court exception to the American rule would not apply. However, it is not our province to make such an assumption. Therefore, we are constrained to remand this narrow issue for a limited remand to the trial court to provide reasons as required under Rule 1:7-4(a) for its denial of Nigito's application for additional fees and costs incurred from October 31, 2022 to February 16, 2023.

IV.

In its cross-appeal, Antoinette's estate contends the court erred in awarding Nigito attorney's fees because "the litigation . . . was not successful or necessary." Antoinette's estate further asserts "there is no applicable statute, court rule or contract which provides for attorney's fees" in this matter.

In its initial decision, the court found this litigation "has been going on for years. This case had to happen . . . . And there is no doubt in looking at this record that I feel [Nigito] will be entitled to attorney's fees" from Antoinette's

estate. As stated above, the court ultimately found an award of attorney's fees to Nigito was "clearly warranted" under the facts presented. The court disagreed with Antoinette's estate that the litigation was needless, noting the case survived multiple "motions to dismiss" at the trial stage. It concluded "there was ample reason why this case had to be brought."

Applying the "fund in court" rule under <u>Henderson v. Camden County Municipal Utility Authority</u>, 176 N.J. 554 (2003), the court found it "ha[d] jurisdictional authority in this type of circumstance" to award Nigito attorney's fees. The court noted "a fund in court must have aided directly in creating, preserving and protecting the fund." The court concluded there were "fiduciary obligations which should have been done and there was—whether it was done and undone and then never done again was all for the wrong reasons. And it's exactly the type of situation that the rule seeks to protect."

We review an award of attorney's fees for an abuse of discretion. <u>McGowan v. O'Rourke</u>, 391 N.J. Super. 502, 508 (App. Div. 2007). An award "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion." <u>Ibid.</u> (quoting <u>Packard-Bamberger & Co. v. Collier</u>, 167 N.J. 427, 444 (2001)).

40

In civil litigation, courts generally "follow the 'American Rule,' which provides that litigants must bear the cost of their own attorneys' fees." Innes v. Marzano-Lesnevich, 224 N.J. 584, 592 (2016) (citing Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 404 (2009)). The American Rule serves to provide "unrestricted access to the courts;" ensure "equity by not penalizing persons for exercising their right to litigating a dispute, even if they should lose;" and provide "administrative convenience." Niles, 176 N.J. at 282.

Yet, the rule has exceptions. In re Est. of Lash, 169 N.J. 20, 27 (2001). "The fund in court exception" to the American Rule "generally applies when a party litigates a matter that produces a tangible economic benefit for a class of persons that did not contribute to the cost of the litigation." Henderson, 176 N.J. at 564 (citing Silverstein v. Shadow Lawn Sav. & Loan Ass'n, 51 N.J. 30, 45, (1968)); see R. 4:42-9(a)(2) ("No fee for legal services shall be allowed in the taxed costs or otherwise, except . . . [o]ut of a fund in court."). This includes cases where the litigation did more than merely advance the interests of the litigant seeking the award. Henderson, 176 N.J. at 564; see also Sarner v. Sarner, 38 N.J. 463, 469 (1962) (providing the exception is available "when litigants[,] through court intercession create, protect or increase a fund for the benefit of a class"). The Court has explained that "when there are classes of

41

claimants to the fund and the services redound to the benefits of others as well, it is fair that all contribute to the cost by a charge against the subject matter" of the litigation. Henderson, 176 N.J. at 564 (quoting Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 168 (1960)).

"'Fund in court' is an equitable term of art." Porreca v. City of Millville, 419 N.J. Super. 212, 225 (App. Div. 2011). Accordingly, the "court need not have jurisdiction over the disbursement of an actual 'fund' to justify an award of attorney's fees" under this exception. Henderson, 176 N.J. at 564. "It is sufficient if, as a result of the litigation, the fund is brought under the control of the court. An illustration of this is a suit to construe a will or a trust agreement." Trimarco v. Trimarco, 396 N.J. Super. 207, 215-16 (App. Div. 2007) (quoting Cintas v. Am. Car & Foundry Co., 133 N.J. Eq. 301, 304 (Ch. Div. 1943)).

In accordance with the foregoing principles, this court has laid out a two-step process to determine the applicability of this exception:

> First, the court must determine as a matter of law whether plaintiff is entitled to seek an attorney fee award under the fund in court exception as articulated in Henderson. If the court determines plaintiff has met the threshold, it then has the "discretion" to award the amount, if any, it concludes is a reasonable fee under the totality of the facts of the case.
>
> [Porreca, 419 N.J. Super. at 228 (quoting R. 4:42-9(a)(2)).]

Here, a fund was "brought under the control of the court" because Nigito "brought suit to construe" Paul's will, including the GST and Sprinkle Trust created under Article Eighth. The suit did more than merely advance Nigito's own interests, as the initial action sought an accounting of assets and interpretation of the will in order to protect the GST's funding for the benefit of a class that was not a party to this litigation—namely, the remaindermen who would come to benefit from the Sprinkle Trust after Nigito's death.

Moreover, the court supported the award of attorney's fees with findings that Antoinette abandoned her fiduciary duties, depriving the GST of funds and precipitating this lawsuit, which successfully imposed liability on Antoinette's estate. Therefore, the court properly determined that Nigito was entitled to seek attorney's fees incurred through October 2022 under the fund in court exception.

Affirmed in part and remanded in part for proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION